## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| CASEY BERNARDINI, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) Civil Action No. CV-25- |
| | ) |
| Cumberland County Sheriff's Office; | ) |
| Sheriff Kevin Joyce; | ) |
| Lieutenant William Brady; | ) |
| | ) |
|     Defendants. | ) |

### COMPLAINT AND DEMAND FOR JURY TRIAL

### JURISDICTION AND VENUE

1. This is an action for money damages for injuries sustained by Plaintiff as a result of sexual assault and coercion in violation of Plaintiff's constitutional and state rights by Jonathan Williams.  Plaintiff also asserts a claim against the Cumberland County Sheriff's Department pursuant to 42. U.S.C. §§1983, 1986 and 1988, the Eighth Amendment of the United States Constitution and 28 U.S.C. 1§§331 and 1342(3).  The aforementioned statutes and constitutional provisions confer original jurisdiction of this Court over this matter.

2. The Court has jurisdiction over the state claims pursuant to 28 U.S.C. §1367(a).

3. The amount in controversy exceeds $75,000, excluding interest and costs.

4. A jury trial is demanded.

## PARTIES

5. Plaintiff is and was, at all times material herein, a citizen of the United States, a resident of the State of Maine, and an inmate in the County of Cumberland.

6. Corrections Officer Jonathan Williams was at all times material herein, a citizen of the United States and a resident of the state of Maine and was employed by Defendant Cumberland County Sheriff's Department acting as a corrections officer at the Cumberland County Jail.

7. Defendant Sheriff operates the Cumberland County Jail (CCJ) which is where Jonathan Williams sexually assaulted Plaintiff while she was an inmate.

8. Defendant Sheriff is being sued on a theory of direct liability with regards to Plaintiff's federal law claims.

9. Defendant Lt. William Brady was the supervisor of the Community Corrections Center where Plaintiff was held.

## FACTUAL ALLEGATIONS

10. In the fall of 2019, Plaintiff was an inmate at the Cumberland County Jail.

11. Upon intake, Casey Bernardini was subjected to a screening to determine if she was at higher risk of being sexually assaulted.

12. At that screening, Casey disclosed factors that placed her in the higher risk category.

13. She was assigned to the Community Corrections Center which was a separate housing facility run within the Cumberland County Jail (CCJ).

14. Casey Bernardini first met Corrections Officer Jonathan Williams while she was housed in the general population section of the CCJ.

15. He engaged in flirtatious behavior with Casey.

16. When he heard Casey was going to be assigned to the Community Corrections Center he told her, "good, I'll have you all to myself."

17. The CCC was designed to provide low-risk inmates with programming and supervision with a goal of facilitating a successful transition back into the community.

18. Typically, in order to qualify to reside in the CCC an inmate had to be identified as low-risk, and have less than six months of their sentence left to serve.

19. Inmates were typically able to begin a job while in the program and/or attend school and/or volunteer.

20. At the time of the incident, the CCC was located on the grounds of the Cumberland County Jail, but within a separate building from the main jail.

21. At the time of the incident the CCC had housing wings on each end of the building.

22. At the time of the incident the CCC had housing wings on each end of the building.

23. One wing was for male inmates and one wing was for female inmates.

24. There was a common dining room in the center where all inmates could interact.

25. There were bathrooms with showers in each housing wing.

26. The common dining area was observable by camera.

27. The CCC also had a staff observation area, with a window through which the common area could be viewed.

28. Lt. Brady, who supervised the CCC, had an office which was in close proximity to the staff monitoring station, the dining area and the staircase to the second floor.

29. The CCJ's Prison Rape Elimination Act (PREA) plan created in August of 2016 included a narrative and graphic description of staffing placements and electronic surveillance locations.

30. This plan identified "blind spots" or places where there was not camera coverage in the facility.

31. The staffing plan required staffing levels and video monitoring to account for all components of the physical plant, including identifying "blind-spots" or areas where inmates may be isolated.

32. On April 27, 2018 the Jack Fitzgerald of Jack Fitzgerald Correctional Consulting, LLC, submitted a final PREA Audit Report to the Cumberland County Sheriff's Office.

33. According to the PREA Audit Report report, identified that a prior "consensual [sexual] encounter"[1] highlighted the risk of blind spots within the facility.

34. According to the PREA Audit Report, the administration was aware of at least one staff on inmate sexual harassment complaint that had been "substantiated" in 2018.

35. According to the PREA Audit Report, the administration was aware of at least nine staff on inmate sexual harassment or sexual abuse complaints that had been made, and at least one staff on sexual harassment complaint which had been "substantiated" in 2018.

36. At the time of the incident, Cumberland County Jail had adopted Policy A-118 which addressed staffing levels at the jail as they relate to Prevention of Sexual Abuse, Sexual Harassment and Sexual Misconduct of Inmates. (PREA Staffing Policy)

---

[1] It is unclear if this sexual encounter was between an inmate and a guard, but if so, under Maine Statute, there is no such thing as a "consensual" sexual encounter between an inmate and a guard.

37. At the time of the incident the Cumberland County Jail had budget approval for approximately 150 positions at the jail.

38. At the time of the incident, approximately 30 positions were vacant and additional staff were on family or medical leave.

39. At the time of the incident, the Cumberland County Sheriff's Office had adopted Policy A-144 *Prevention of Sexual Abuse, Sexual Harassment and Sexual Misconduct of Inmates/ PREA* (PREA Policy*.)*

40. The PREA Policy was a 28 page policy outlining the requirements to prevent, detect and respond to PREA incidents.

41. Within the PREA Policy was a specific provision that when an opposite gender guard was entering a housing unit, they should announce "Female-in-Pod" or "Male-inPod" to make the inmates aware of the officer's arrival.

42. Within the PREA Policy was a specific provision that required unannounced intermediate-level or higher level supervisors conduct and document unannounced rounds to identify and deter staff sexual abuse and sexual harassment.

43. Within the PREA Policy was a specific provision that required inmates to be allowed to shower, perform bodily functions, and change clothing without non-medical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks.

44. Defendants were aware that all of these policies existed with the express purpose of reducing the risk of staff on inmate sexual harassment or sexual assault.

45. During the time Plaintiff was housed in the CCC, male corrections officers, including Jonathan Williams routinely entered the female side of the housing unit without announcing "male-in-pod" in violation of the policy.

46. During the time Plaintiff was housed in the CCC, male corrections officers, including Jonathan Williams routinely observed female inmates in the shower area, without exigent circumstances in violation of the policy.

47. During the time Plaintiff was housed in the CCC, male corrections officers, including Jonathan Williams entered the female-housing side of the unit alone and interacted with female inmates without supervision of other officers and without being visible on camera in contradiction to the PREA staffing plan.

48. During the time Plaintiff was housed in the CCC, male corrections officers, including Jonathan Williams interacted alone, with female inmates in other isolated parts of the CCC, without direct supervision of other officers and without being visible on camera in contradiction to the PREA Staffing plan.

49. During the time Plaintiff was housed in the CCC, at least one male corrections officer with a history of an "inappropriate sexual relationship"[2] with an inmate was assigned to the CCC.

50. When Casey Bernardini was assigned to the CCC in the fall of 2019, Jonathan Williams was one of the corrections officers routinely assigned to the CCC.

51. During the time Plaintiff was housed in the CCC, there were many periods of time during they day when she was the only female inmate at the CCC as the others left for employment.

52. Jonathan Williams initially engaged in friendly conversation with Casey.

---

[2] The administration has referred to this relationship as "inappropriate" in the past but as mentioned in FN1 there is no legal sexual relationship between a guard and an inmate.

53. Jonathan Williams routinely entered the residential dining area alone with Casey.

54. Jonathan Williams routinely entered the female housing unit alone with Casey.

55. Jonathan Williams routinely entered Casey's cell alone with Casey.

56. Jonathan Williams routinely entered the shower area alone with Casey.

57. Jonathan Williams told Casey that he knew where the blind spots were, and where to go within the CCC to be unsupervised.

58. During the last two weeks of Casey's incarceration, Jonathan Williams engaged in sexual activity with Casey on at least three occasions.

59. Two occasions included oral sex.

60. One occasion included penile penetration.

61. The last incident occurred within a few days of her release.

62. Casey was released on December 7, 2019.

63. One sexual encounter occurred in the residential dining area.

64. One sexual encounter occurred in Casey's cell.

65. One sexual encounter occurred in bathroom.

66. All of these sexual encounters went unnoticed by any other members of the CCJ staff.

67. Jonathan Williams was convicted of sexual assault against Casey Bernardini for these incidents.

68. As a result of these actions, Casey Bernardini had a relapse of her previously existing substance use disorder.

69. It took years for Casey to become sober.

70. As a result of these actions, Casey Bernardini suffered from mental harm, including suffering from PTSD.

71. Casey has engaged in therapy and treatment for her PTSD, and while she is significantly better than she was immediately after the incident, she still suffers from the effects of PTSD.

72. As a result of these actions Casey has suffered other mental, physical and emotional damage.

### COUNT I-Monell Liability

73. Plaintiff repeats and re-alleges and incorporates by reference all prior paragraphs of this Complaint.

74. Defendant Cumberland County Sheriff Joyce and Defendant Lieutenant William Brady are liable for the violation of Casey Bernardini's Constitutional rights.

75. Jonathan Williams violated the Plaintiff's rights pursuant to 42. U.S.C. § 1983 while acting under the color of law, as an employee of Defendant Sheriff and while under the supervision of Defendant Lt. Brady.

   a.) *Violation of Clearly Established Constitutional Rights*

76. The conducted described *supra* establishes that Jonathan Williams violated Plaintiff's clearly established Eighth Amendment right against cruel and unusual punishment, by sexually assaulting her during her incarceration.

77. Under color of law, and in his capacity as jail guard, he violated and deprived Plaintiff of her clearly established and well-settled Constitutional right to be free from sexual assault by a supervising jail guard.

   b.) *Custom or Practice*

78. The CCJ, under Defendant Sheriff Joyce had a number of policies, as described above, under the umbrella of its PREA policy.

79. The explicit purpose of the PREA Policy was to reduce the possibility of sexual assault within the facility including staff-on-inmate sexual assault.

80. Despite these policies, under the supervision of Defendant Lieutenant William Brady, there was a custom of allowing these policies to be broken in the CCC.

81. Male corrections officers routinely accessed the known isolated areas or "blind spots" with female inmates.

82. Male corrections officers routinely entered the shared the female housing unit without announcing "male-in-pod".

83. Male corrections officers routinely entered the bathroom and shower area in the female housing unit, from where they could observe female inmates while they were nude, absent exceptional circumstances requiring their presence.

84. This custom of not following the policies allowed Jonathan Williams to have unfettered access to all areas of the CCC, including the blindspots, with impunity.

    c.) *Reckless Disregard*

85. Defendants Sheriff Joyce and Lieutenant Brady were aware of the impact "blind spots" had on inmate safety with respect to sexual assault.

86. Defendants were aware that "blind spots" had contributed to at least one sexual assault in the year prior.

87. Defendants were aware that at least one staff on inmate sexual assault had been substantiated in each year in 2017 and 2018.

88. Defendants knew or should have known that the custom of allowing male officers to routinely violate the PREA policies within the CCC would place the female inmates in increased danger of sexual harassment or assault.

89. In addition, Defendants knew or should have known that allowing male officers to routinely violate the PREA policies created a custom of lax attention to the policies, which allowed the "blind spots", lack of supervision, and other aspects of the physical plant layout to be exploited by a malicious corrections officer.

90. Defendants' recklessly disregarded the risk that a Constitutional violation would occur by allowing a custom of lax adherence to the PREA policies within the CCC which directly led to the sexual assault committed by Jonathan Williams against Casey Bernardini in violation of the Eighth Amendment of the Constitution.

   d. Proximate Cause

91. This custom placed all female inmates housed at the CCC at heightened risk of sexual harassment or sexual assault by male corrections officers.

92. This custom specifically allowed Jonathan Williams to have access to Casey Bernardini in isolated locations with impunity.

93. This access to isolated locations and lack of consequences for accessing isolated locations allowed Jonathan Williams the opportunity and location to sexually assault Casey Bernardini.

94. As a direct and proximate result of the assault and sexual battery of Plaintiff, Plaintiff suffered physical injury, pain and suffering, mental anguish and humiliation as alleged in this Complaint.

95. As a result of Defendants' violations of Plaintiff's constitutional rights, Plaintiff has suffered physical injury, emotional distress and other damages, both compensatory and punitive, for which she seeks compensation.

## JURY TRIAL REQUEST

96. Plaintiff requests a trial by jury.

WHEREFORE Plaintiff prays for judgement on each and every count in an amount reasonably compensates for all damages, together with punitive damages, interest, costs and an award of reasonable attorney fees and other litigation costs incurred in the bringing of this action pursuant to 42 U.S.C. §§1983, 1985 and/or §12131, and 5 M.R.S.A. § 4683, to the highest extent allowable by law, from the earliest time allowable by lawn and grant such further relief as the Court may deem just and proper.

Dated this 21st day of November, 2025        /s/ Kristine C. Hanly, Esq.

Attorney for Casey Bernardini
Hanly Law
254 Commercial Street, Suite 245
Portland, ME 04101
(207) 281-4999
Kristine@HanlyLaw.com